[Crim. No. 46.  Fourth Appellate District.—July 17, 1931.]

THE PEOPLE, Respondent, v. EVAN GOLTRA, Appellant.

Thomas Wade Cochran for Appellant.

U. S. Webb, Attorney-General, John D. Richer, Deputy Attorney-General, Earl Redwine, District Attorney, and Harry Amstutz, Deputy District Attorney, for Respondent.

· MARKS, J.—Appellant was convicted of the crime of robbery in the first degree. From the judgment pronounced upon him and from the order denying his motion for a new trial, he has prosecuted this appeal.

The information filed by the district attorney of Riverside County charged appellant with the crime of robbery accomplished by means of force or fear on the twenty-ninth day of December, 1930, and alleged a previous conviction of a felony. Appellant went to trial on his plea of guilty to the prior conviction, and of not guilty to the offense charged.

The evidence shows that Charles E. Ives was in charge of a one-man car of the Pacific Electric Company operating in the city of Riverside on December 29, 1930. Shortly before 8 o'clock on the evening in question Ives reached the southern terminal of his run near Jurupa Avenue in the city of Riverside. He alighted from his car and proceeded to change his trolley for the return trip. While doing this he observed two men walking toward him. When he had reached the rear of the car and was attempting to place the trolley upon the wire, one of the men thrust something hard like a piece of iron into his back and told him to raise his hands and keep them up. This man went through his pockets and took a purse containing $7.45 from the rear pocket in his trousers, and three silver half-dollars from a side coat pocket. Ives did not see this man during the robbery. The other man, whom Ives identified at the trial as Carl Thompson, came up in front of him and attempted to get the money out of the changer which he carried on a belt around his waist. He was not able to open it and abandoned the attempt. The two men told Ives to make connections with his trolley, get in his car and run it back to the center of the city of Riverside rapidly without looking back. He promptly complied with this demand. After he had proceeded about 150 feet toward the business center of Riverside he saw an automobile approaching from the rear. As it went by Ives saw a man leaning out over the

right door looking back toward the street-car. After going about 100 or 150 feet ahead of the street-car, the automobile was slowed down and traveled alongside for some distance. The man who had leaned from the automobile was identified by Ives as the appellant.

The city of Colton is distant from Riverside about seven or eight miles. Appellant, Carl Thompson, and an unidentified third person were seen in the restaurant in Colton a few minutes before 10 o'clock on the evening in question. They alighted from an automobile parked near the restaurant door, which they left with its engine running and its lights illuminated. Thompson and appellant registered under assumed names at a rooming-house in Colton about 12 o'clock that same night.

Appellant was arrested in the city of Los Angeles on January 26, 1931. He was taken to the office of the sheriff of Los Angeles County, where several conversations took place. The foregoing evidence, together with the inferences drawn from these conversations furnish the evidence upon which the jury returned its verdict of guilty.

Appellant denied that he committed the crime or had any connection therewith. He testified that he spent the entire day and night of December 29, 1930, at his home in the city of Los Angeles with his wife, his three minor children and for about three hours in the evening between 7 and 10 o'clock with two friends, a Mr. and Mrs. Miller, with whom he and his wife visited and played cards. Appellant's testimony in this regard was corroborated by Mrs. Goltra and by Mr. and Mrs. Miller.

Appellant presents twenty-five specifications of error upon which he relies for the reversal of the judgment and the order denying his motion for new trial. As many of these specifications relate to the same errors occurring in the testimony of various witnesses it will be unnecessary to consider all of them.

He first complains of the admission in evidence of a conversation between Carl Thompson and Ives which occurred at about 5 o'clock in the evening of January 24th, 1931, during which appellant was not present. It appears in the record as follows: "Q. Just state what you saw and what you did and the conversation. A. I went down to the jail. Q. All right. A. The city jail in Riverside, or the

county jail, I guess it was. Q. The county jail? A. The county jail. And I walked in and saw the jailer, and asked him if they had brought—The Court: You can't relate any conversation. Just state what you did. A. I stepped up to the jailer and asked to see— Mr. Cochran: I object to what he asked him. Q. (By Mr. Amstutz, continuing): Just confine yourself, Mr. Ives, to what you did, and what you said, or what was said, in the presence of Mr. Thompson. Mr. Cochran: I object to that question as calling for hearsay; it is certainly not admissible unless the defendant Goltra was present. The Court: Overruled. Read the question. (Last question read by reporter as follows: 'Q. Just confine yourself, Mr. Ives, to what you did, and what you said, or what was said in the presence of Mr. Thompson.') A. I went into the lobby and sat down behind the door in a chair, and waited for officers Scott and Crane to bring the prisoner in. And I waited there for possibly a half hour or more, and I saw them then coming up the steps to the jail. They came in through the door, and Mr. Scott was on the right of Mr. Thompson, and Mr. Crane was on the left. They saw me sitting there back of the door, and they turned Mr. Thompson around facing me, and Mr. Scott says— Officer Scott asked Mr. Thompson— Mr. Cochran: Just a moment, please. May I interrupt? Now it is very evident what is being called for here and what is to be related is inadmissible, and calling for the statements of another person made not in the presence of the defendant Goltra. I respectfully ask the court to refer to page 1 of my trial brief, which has set forth the cases right down to the present time, that any admission of any statements of an alleged co-defendant made outside of the presence of the defendant on trial, are purely inadmissible and are hearsay. Mr. Amstutz: I think this goes to the identification. The Court: Overruled. Mr. Cochran: May it be restricted to the identification of this man Thompson? The Court: I can't tell. You may make a motion to strike. Read the question. (Last question read by reporter as follows: 'Q. Just confine yourself, Mr. Ives, to what you did, and what you said, or what was said in the presence of Mr. Thompson.') A. (Continuing): if he had ever seen this man before, pointing at me as I sat there in the county jail. Mr. Thompson, he spoke up and identified me. I sat there

for a few minutes. I then asked him the question why he held me up, and he said 'Because they were broke'. I then asked him what part he took in the hold-up.''

The conclusion that this conversation was inadmissible in evidence against appellant is supported by the cases of *People* v. *Gonzales*, 136 Cal. 666 [69 Pac. 487], and *People* v. *Matthew*, 194 Cal. 273 [228 Pac. 424]. While the admission of this testimony was error, its prejudice does not appear until it is considered in connection with the testimony of Deputy Sheriff Joseph B. Kelley, a portion of which is hereinafter quoted. It should be borne in mind that Thompson, in the foregoing conversation, virtually admitted that he was one of the men who participated in the robbery of Ives.

The next testimony to which we need to direct our attention is a portion of that of Joseph B. Kelley: ''Q. Now, when did you have a conversation with the defendant Goltra in connection with this case? A. He was immediately taken into the office of Capt. Stensland, of the Robbery Squad, Sheriff's office. At this time— Q. Who else was there, officer, anybody? A. Capt. Stensland, Deputy Sheriff Williams of Los Angeles, Deputy Sheriff Crane of Riverside, Officer Scott of Riverside, and Officer Smith of the Pacific Electric and Mr. Fish of the Pacific Electric. Goltra at this time asked me what it was all about; and I stated to him that he was wanted for robbery and suspicion of murder in Riverside. At this time he stated to me, he stated, 'You are all wet.' At this time—a little while later, maybe about three or four minutes later, Mr. Thompson was brought into the office of Capt. Stensland and was asked was this the man, and he stated, 'Yes, that is the man.' Q. Meaning who? A. Meaning Goltra. Goltra was the man seated at the end of the table nearest the hallway. Q. Anything further said to the defendant Goltra at this time about Mr. Thompson? A. Not at that time. Q. State what further conversation you had with the defendant Goltra? A. After Thompson left the room Goltra was asked whether he knew Thompson or not, and he said, 'No, I have never seen him; I don't know him.' And then, did Thompson ever see him? And he said, no, he had never saw him. We asked him if he had a gun at his house, and he said, 'No.' And I spoke up and I asked him positively, I said,

'Evan, are you positive you have not got no gun in the house?' He said, 'Mr. Kelley, I certainly am absolutely positive there is no gun in my house.' The men, or Inspector Scott of Riverside, and Deputy Sheriff Williams and Monteleon and Mr. McDermott and Officer Smith of the Pacific Electric, left to search Mr. Goltra's house. I was not there. In the meantime Attorney Cochran came into the office and requested to see defendant Goltra, and I brought him into the room, and Mr. Cochran asked him, he said, 'What is all this about?' And I stated to Mr. Cochran that he was wanted in Riverside for robbery and suspicion of murder; and he said it was a very serious proposition; that he knew no physical abuse would come to Mr. Goltra, and knew very well he was going to be thoroughly questioned. Mr. Cochran then stated to Mr. Goltra that he would see him the following day, and Mr. Cochran left. After Mr. Cochran left, I stated to Goltra, I said, 'You are in an awful jamb,' and I said, 'If you can give us any explanation', I said 'I have got nothing against you, and if you can give us proper explanation that this man Thompson is lying', I said, 'I will go to the bat for you.' I asked him then, 'How do you explain, Mr. Goltra'—or 'Evan', I called him,—'Evan', how can you explain that this man Thompson can pick your picture out of 18 men, and you claim you never saw him.' He said, 'I can't explain it.' Mr. Cochran: I am going to ask that that previous answer and question, or question and answer be stricken from the record. The Court: What is the purpose of the objection? Mr. Cochran: It is an accusatory statement, immediately and promptly denied by the defendant. His reaction to it was that of any innocent man. The Court: Overruled. Q. Have you those pictures, officer? A. Yes, sir (producing pictures). I stated to him at that time that there was first, 12 pictures shown to him, and Thompson stated none of them were Goltra. I stated, then, that I personally brought in—I went to the record room and picked six more pictures, among which was the defendant Evan Goltra, Charles Goltra and Raymond Goltra, and three other pictures, and laid then on the table, face up, and warned Thompson not to look on the back, as the names was on the back of them. Thompson goes up, and I told Evan, immediately picked out the picture. Q. Have

you the picture that he picked out? A. Yes, sir, I have (producing picture). Q. This is the photograph that was there? A. The identical photograph picked out by Mr. Thompson. Mr. Amstutz: We offer that photograph into evidence. Mr. Cochran: We object to that; no proper foundation laid, and no showing it was shown to the defendant Goltra at all. Nothing but a conversation about something which was alleged to have taken place between Thompson and the officer at another time, and would be calling for hearsay, and is inadmissible. The Court: Did you show that picture to Goltra, Officer? A. No. Q. But you did tell him— A. Yes, sir. Mr. Amstutz: And what did he say, when you told him? Mr. Cochran: I would like to have the court's ruling on the objection. The Court: It will be admitted as People's 3, State's Exhibit 3. Mr. Cochran: I don't know whether this particular fact is clear. I would like to restate, briefly, this fact; The picture was not shown to the defendant Goltra at all. The Court: I understand that. Mr. Cochran: Merely a conversation had with him, in which the officer stated, at another time and place, someone identified his picture. Now, this picture is offered in evidence as having been shown to someone else outside of the presence of the defendant Goltra. The Court: To prove his identification. Yes, I understand. Mr. Amstutz: As soon as the Court marks that, I would like to show it to the jury. (Picture shown to the jury) Q. Now, Officer Kelley, what else was said on that occasion,—anything? A. I asked Mr. Goltra if he could explain how it was that Thompson could tell us the exact street and corner where the street car turned, to get off—to go to his home, if he did not know him; and he said, no, he could not; could not make any explanation. Mr. Cochran: I will make the same motion with respect to that conversation, as previously made. The Court: Overruled. Q. On the following day what did you do, Officer? A. The following day I procured a court order from department 23; on the following day I took the defendant, Evan Goltra, into department 23, with Judge Doran presiding, and at this time Mr. Cochran was present, and he was surrendered on his bond there for his appearance in court. Judge Doran granted the motion to surrender him; and after this was heard, I procured a court order from Judge Doran to bring the defendant,

Evan Goltra, to Riverside for arraignment on the robbery charge."

Officer Kelley further testified as follows: "Q. On January 26, according to your testimony, I believe, you had a conversation with this defendant? A. I did Q. And at that time was there anything further said concerning the identification of the gun which has been offered in this case, by Mr. Thompson or anyone else? A. Yes, sir. While the officers, or Inspector Scott, Deputy Sheriff Williams and the other officers were over to the house searching for this gun, and in my conversation with the defendant Goltra, I asked him about the gun, and he stated that there was no gun in his house. I told him, I said, 'This fellow Thompson says that the third man in the robbery gave you the gun and that you were supposed to forward the gun to him at Sacramento.' He said, 'No, that is not a fact.' I said, 'Thompson described the gun as an old gun.' He said, 'No, I haven't got no gun.' When the gun was brought back to the Sheriff's office, we showed it to Mr. Goltra. He said, then, 'That is the gun,' maintaining that that was the gun that he got from Gordon. We showed it to Thompson, then, and Thompson said— Mr. Cochran: Just a moment. I object to what Thompson said, not in the presence of the defendant Goltra. The Court: Was that in the presence of the defendant Goltra? A. No, sir. The Court: Sustained. Q. (By Mr. Amstutz, resuming): Thompson identified this gun, didn't he? Mr. Cochran: The same objection. Q. (By Mr. Amstutz, continuing): And the identification was later communicated to the defendant Goltra; is that true? Mr. Cochran: That is objected to for the same reason as previously stated,—that it is calling for hearsay and inadmissible evidence. The Court: Sustained. I will allow the witness to state what words he used, regarding what Thompson said about the gun when he was talking with Goltra. Mr. Amstutz: Very well. Q. (By Mr. Amstutz continuing): Have you finished your conversation with Goltra concerning the gun? A. After we went outside into the outer room where Goltra was, and we returned to the room where Goltra was—there is Capt. Stensland's office, and there is a main assembly room of the robbery detail. The night of the 26th, after the gun was brought back, the defendant Goltra was sitting in the captain's office at one end of the

table. Thompson was sitting in the assembly room then. After we had shown the gun to Thompson, we returned to the captain's office, and told Goltra that Thompson had stated that that was the gun that the third man in the robbery had given to Goltra. He said no, that it was not; that he got it from Gordon, and that he had returned it to Gordon on the 18th. Mr. Cochran: I ask that that particular portion of the conversation be stricken out as accusatory in its nature, and denied by the defendant,—that portion where the witness stated to Goltra that Thompson had said to the witness that that was the gun that was used in the robbery, and that the defendant immediately denied it. I ask that that be stricken out, and the jury instructed to disregard it. The Court: Was that the same gun that you related a conversation concerning yesterday as having been found in Goltra's house? A. Yes, sir. The Court: Objection overruled. Q. That is the conversation, then, is it, concerning the gun on that occasion? A. Yes, sir. Q. Did you have any further conversation at that, or at any time, concerning certain whereabouts of the defendant Goltra? A. In my conversation with Goltra I asked him— Mr. Cochran: I would like to have the foundation laid a little better for that conversation. The Court: All right. Q. (By Mr. Amstutz, continuing): Just give the time and place. A. That was on the evening of January 26th. Q. Whereabouts? A. A portion of this conversation was between Goltra and myself alone. Another portion of it was in the presence of Capt. Stensland, Mr. Fish, Mr. Smith, and Deputy Sheriff Crane, of Riverside; and occurred about between 7:30 and 8:30 P. M. The conversation was to the effect of how it was that Mr. Thompson could describe— Mr. Cochran: I ask that the witness state what was said, and not what the effect of the ocnversation was. That is a conclusion. The Court: Give the language, if you can. A. I will give the language as nearly as possible. I cannot give it word for word, Mr. Cochran. Mr. Cochran: All right. A. I said to Goltra, I said, 'Goltra, Thompson tells us that he knows you. He told us that you were on trial in the superior court, awaiting a probationary hearing for a forgery of a check, which was the proceeds of the Oxnard robbery.' I said, 'Besides that, he knows where you live; he can describe to us the corner that you get off to go to

your home, the point where the cars turn, and the signal bell stop.' I said, 'If you don't know, never saw him, and he never saw you, how can he tell those things?' He said, 'I don't know.' Mr. Cochran: The same objection with respect to that I did a few minutes ago, that it is accusatory in its nature, and was immediately denied by the defendant, and is not admissible, and hearsay. Mr. Amstutz: It goes to the question of identity. The Court: Motion denied.''

Testimony to the same effect elicited from several officers of Riverside and Los Angeles Counties is contained in the record and was admitted over the strenuous and persistent objections of appellant. He made repeated motions to strike all of this testimony, which motions were denied by the trial court.

Other testimony of Officer Kelley was as follows: ''Q. In your testimony yesterday something was said about a conversation with the defendant Goltra concerning one Charles Gordon. Is that true? A. That is correct, yes, sir. Q. Will you state whether or not you have made any investigation concerning such an individual? A. I did. Q. State what investigation you made? A. At the time that Mr. Goltra stated that he had received a gun from Charles Gordon on January 16, and that he had returned it to Mr. Gordon on January 18th, the day before his probationary hearing in the Los Angeles courts, I asked him who Charlie Gordon was, and he told me that he was a brakeman working for the Southern Pacific railroad, working on the San Joaquin division. The day after that, January 28th or 29th, I took the matter up with Mr. Dolan, who is personal record clerk for Mr. T. H. Williams, assistant general manager of the Southern Pacific railroad, and he went over the records and stated— Mr. Cochran: I object to what he stated. The Court: Yes. A. My investigation disclosed that there was no one working on the Southern Pacific railroad under the name of 'Charles Gordon'. Q. No such individual? A. No, sir. Q. Had there ever been on the division? A. Not according to the records, no sir.'' Appellant's motion to strike out this testimony was denied at the close of the People's case.

There are certain portions of the foregoing testimony, such as the statements of Goltra that he did not have a gun in his possession at his home, which were afterward proven

false and were admissible in evidence. There are other portions, however, that are inadmissible under any possible hypothesis or theory of the case and are highly prejudicial to appellant.

■ It is to be observed that appellant flatly denied the foregoing statements that Thompson had identified him as one of the men participating in the robbery, and that the pistol which was found at his house had been given to him by a third person who participated in the robbery and had been used by appellant in committing the offense. The law governing such a situation is clearly stated in 8 California Jurisprudence, at page 101, as follows:

"It is provided in substance in the Code of Civil Procedure that evidence may be given of the act or declaration of another in the presence and within the observation of a defendant and of his conduct in relation thereto. While the contrary has been stated generally in a few cases, it is undoubtedly the California rule that statements of third persons are not admissible in evidence simply because they were made in the presence and hearing of the accused. It is only when there is something in the conduct of the accused in response thereto that it is material to the issue that they are admissible at all, and they are admissible then solely for the purpose of explaining his conduct. In other words, it is only the conduct of the accused that is evidence in such cases.

"If it is proved that the defendant made incriminating statements or admissions, or failed to deny an accusation under circumstances which may be construed as an admission of its truth, or that he failed to act as it might reasonably be expected that an innocent person would act, evidence of the statement is admissible in connection with evidence of his conduct as an admission or declaration made by him. But if the defendant promptly and fully deny the charge, there is no admission on his part to be introduced in evidence."

In *People* v. *Lapara*, 181 Cal. 66 [183 Pac. 545, 547], it was held as follows:

"This testimony of the witness Gallagher was objected to and followed by a motion to strike out upon the ground of its incompetency, irrelevancy and immateriality, and upon the further ground that a denial by the defendant

of the accusation of guilt rendered the accusation and the conversation which led to it inadmissible for any purpose. It was error to overrule the objection and likewise error to deny the motion to strike out. 'It is only the guilty conduct or incriminating reply of a defendant in response to an accusation of crime or statements implicating him in its commission, that constitute relevant, competent evidence of that crime. Ordinarily, when a defendant, under conditions which fairly afford him an opportunity to reply, stands mute in the face of an accusation of crime, the circumstance of his silence may be taken against him as evidence indicating admission of guilt. (Citing cases.) But if he promptly and fully deny the charge, the accusatory statements, standing alone, are not in any sense competent evidence of the defendant's guilt (*People* v. *Estrado,* 49 Cal. 171; *People* v. *Ah Yute,* 54 Cal. 90), and should in such a contingency be excluded from the consideration of the jury. As was said in the case of *People* v. *Teshara,* 134 Cal. 542 [66 Pac. 798], "the court and the district attorney seem to have lost sight of the fact that it is not the accusation but the conduct of the accused that is evidence in such cases, and that the only reason for admitting an accusation is to explain the conduct".' (*People* v. *Ayhens,* 16 Cal. App. 618 [117 Pac. 789].) In the Teshara case this court declared that the district attorney should not have offered the statement, knowing, as he did, that the accused had not stood silent before the accusation, but had repelled it at the time it was made; and it may not be amiss to reiterate that, for the same reason, the district attorney in the present case should not have offered the accusatory statement complained of."

■ It appears from the record that the picture which Kelley testified was identified by Thompson as that of appellant was taken from the files in the office of the sheriff of Los Angeles County, which records are commonly known as the "rogues gallery". It is a matter of general knowledge that these pictures are taken of prisoners arrested for the commission of a crime. No witness appearing at the trial identified this picture as being that of appellant. There is also an irresistible inference to be drawn from the testimony that Thompson had identified this picture as that of one who participated in the robbery with him, he hav-

ing admitted in his conversation with Ives at the county jail of Riverside County that he was one of those who committed the robbery. The question of the admission in evidence of a photograph in the case of *People* v. *Thorp,* 104 Cal. App. 379 [285 Pac. 916], is somewhat similar to the one in the instant case. The judgment in the Thorp case was reversed because of the admission in evidence of a photograph taken from the files of a criminal identification bureau without it having been identified as that of the defendant by any witness appearing at the trial. The officers producing the picture testified that it had been identified as the picture of Thorp by third persons who were not produced as witnesses.

The testimony of Officer Kelley concerning the proceedings taken before department 23 of the Superior Court of Los Angeles County discloses that a criminal proceeding was pending against Goltra in that court in which no final judgment had been entered. It went further and showed that appellant was accused in that action of "a forgery of a check which was the proceeds of the Oxnard robbery". This case had not been brought to a conclusion and as no judgment had been pronounced, appellant had not been convicted of this felony. This evidence has no place in the record. Its effect on the jury cannot have been otherwise than highly prejudicial.

Kelley's testimony concerning his investigation which disclosed that the records of the Southern Pacific Railroad Company failed to show that Charles Gordon ever worked for such company on the Bakersfield division was hearsay and should not have been admitted. The officers of the railway company were available as witnesses and their records were open for inspection. Kelley should not have been allowed to testify as to what he was told by these officers either in the form of a direct statement or that his investigation, based upon the contents of the records, and the conversations, showed that Gordon had not been employed on the Bakersfield division of the railroad.

It remains for us to determine whether the conviction of appellant can be affirmed under the provisions of section 4½ of article VI of the Constitution. It is true that in a multitude of cases where the evidence of the guilt of the defendant is clear and convincing the courts have sustained

convictions where errors occurred in the record. With this constitutional provision in mind we have examined the entire record and all the evidence to determine whether or not the errors occurring in the trial court resulted in a miscarriage of justice, and have reached a conclusion in accordance with the views expressed in the case of *People* v. *Walker*, 69 Cal. App. 475 [231 Pac. 572, 582], as follows:

"We must say under this record that 'we are unable to determine whether appellant would or would not have been convicted but for the errors of the court. . . . Under such circumstances the provisions of section $4\frac{1}{2}$ may not be availed of to support the judgment of conviction'. (*People* v. *Irby*, 67 Cal. App. 520 [227 Pac. 920].)"

It will not be necessary to consider any other errors occurring at the trial of which appellant complains. Many of them are similar to those which we have set forth. The one instruction given to the jury of which appellant complains does not contain a correct statement of the law. However, other instructions given cure the defect and do not render the instruction prejudicially erroneous. It should not be given upon another trial of the case.

The judgment and order denying appellant's motion for a new trial are reversed and a new trial is ordered.

Barnard, P. J., and Griffin, J., *pro tem.*, concurred.